******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE OREOLUWA O.*
(SC 19501)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued November 5, 2015—officially released May 31, 2016\*\**

*Michael S. Taylor*, assigned counsel, with whom were *James P. Sexton*, assigned counsel, and, on the brief, *Matthew C. Eagan*, assigned counsel, for the appellant (respondent father).

*Michael Besso*, assistant attorney general, with whom were *Jessica B. Gauvin*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Owen Murphy*, for the minor child.

*Opinion*

EVELEIGH, J. In this certified appeal,[1] we must decide whether the Appellate Court properly affirmed the judgment of the trial court terminating the parental rights of the respondent father, Olusegun O., as to his minor son, Oreoluwa O.[2] See *In re Oreoluwa O.*, 157 Conn. App. 490, 116 A.3d 400 (2015). On appeal, the respondent asserts, inter alia, that the Appellate Court improperly affirmed the judgment of the trial court concluding that the Department of Children and Families (department) had made reasonable efforts to reunify Oreoluwa with the respondent in accordance with General Statutes (Supp. 2016) § 17a-112 (j) (1).[3] We agree with the respondent and, accordingly, reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "The respondent, together with his wife, Oreoluwa's mother,[4] live in Nigeria. Oreoluwa's mother traveled to the United States while pregnant [and gave birth to him in the United States]. Prior to his birth, it was determined that he suffered significant congenital heart defects, and he was diagnosed with several complex heart conditions after he was born. Initially, he was released from the hospital to his mother's care, and the two lived with a family in Milford for a short time after his birth before moving into a hotel. In mid-April, 2013, when he was approximately three months old, Oreoluwa was readmitted to the hospital, where medical personnel observed his mother behaving erratically and having difficulty administering his medications.

"On May 3, 2013, the petitioner, the Commissioner of Children and Families (commissioner), sought from the court an order of temporary custody and filed a neglect petition as to Oreoluwa. The commissioner alleged that Oreoluwa was neglected in that he was being denied proper care and was being permitted to live under conditions injurious to his [well-being], and that he was uncared for in that his home could not provide the specialized care that he required. Oreoluwa was adjudicated neglected and committed to the custody of the commissioner. The court approved specific steps for the respondent to take so he could be reunited with Oreoluwa. On December 23, 2013, the commissioner filed a petition for the termination of the respondent's parental rights regarding Oreoluwa on the grounds that (1) Oreoluwa had been abandoned by the respondent in the sense that he failed to maintain a reasonable degree of interest, concern, or responsibility as to [Oreoluwa's welfare], and (2) there was no ongoing parent-child relationship with the respondent 'that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral, and educational needs of [Oreoluwa] . . . and [that] to allow further time for the establishment or reestablish-

ment of the parent-child . . . relationship would be detrimental to [Oreoluwa's] best interests . . . .' On February 27, 2014, the court entered a default as to the respondent because of his failure to appear at the plea hearing. . . .

"The hearing on the termination of parental rights petition was held on March 12, 2014. On March 20, 2014, the court rendered an oral decision terminating the parental rights of the respondent. The respondent subsequently filed a motion for reargument and reconsideration, which was denied. On June 14, 2014, the respondent [appealed]. The respondent also filed a motion for articulation of the decision to terminate parental rights, which was denied. The respondent filed a motion for review with [the Appellate Court], which granted the motion. On October 10, 2014, the trial court issued its articulation.

"The court found by clear and convincing evidence pursuant to . . . § 17a-112 (j) (1) that the department made reasonable efforts to reunify Oreoluwa with the respondent given the circumstances. The court noted that 'the [respondent's] absence from the state, and indeed from this country, has limited the type and number of services that the department has been able to provide to him. When a parent is not available to participate in services, the reasonableness of the department's efforts must be judged in that context.' The court explained that although the department was not able to provide [the respondent with] services, it had provided him with contact information for the Nigerian consulate in New York, maintained communication with him, investigated a possible placement resource for Oreoluwa suggested by the respondent, and attempted, although unsuccessfully, to set up visitation via [an Internet based video conference system known as] Skype. . . .

"After finding that the allegations of the petition were proven by clear and convincing evidence, the court then determined whether termination was in the best interest of Oreoluwa. The court considered the seven statutory factors and [in its articulation] made written findings as to each factor pursuant to § 17a-112 (k). The court ultimately concluded that there was clear and convincing evidence that it was in Oreoluwa's best interest to terminate the respondent's parental rights." (Footnotes altered.) *In re Oreoluwa O.*, supra, 157 Conn. App. 493–96.

The respondent appealed from the judgment of the trial court to the Appellate Court. On appeal, the respondent claimed that the trial court improperly determined that "(1) the [department] made reasonable efforts to reunify him with Oreoluwa, (2) the respondent abandoned Oreoluwa, and (3) the respondent had no ongoing parent-child relationship with Oreoluwa. He also claim[ed], on behalf of Oreoluwa, that the guarantee of

due process under the fourteenth amendment to the United States constitution required the trial court to provide the respondent with notice of alternative means of participation in the termination trial and required the court to undertake reasonable efforts to use those alternative means." Id., 492–93.

The Appellate Court affirmed the judgment of the trial court. In regard to the reunification efforts, the Appellate Court recognized as follows: "The department maintained communication with the respondent via e-mail and telephone calls, and, when the respondent indicated a possible placement resource for Oreoluwa with an attorney in Philadelphia, the department contacted the potential resource. The department was later informed by the [respondent], however, that he no longer wished for the potential placement resource to be involved. Although the respondent argues that these efforts by the department did not actually relate to reunification, we conclude that under the circumstances of the present case, the actions taken by the department were reasonable and related to reunification." Id., 501.

The Appellate Court further concluded that the trial court's findings as to reasonable efforts had adequate evidentiary support. Id. In regard to the trial court's finding "that the respondent's absence from the country prevented the department from being able to provide him with any services," the Appellate Court agreed that "the reasonableness of the department's efforts must be assessed in light of this key finding." Id. In view of the foregoing, the Appellate Court concluded that "the trial court's finding that the department made reasonable efforts to reunify Oreoluwa with the respondent was not clearly erroneous." Id., 502. This appeal followed.

Although the respondent has raised several issues on appeal to this court,[5] we need address only one, because our resolution of that claim is dispositive of the appeal. The respondent claims that the Appellate Court improperly affirmed the judgment of the trial court because the department failed to undertake the reasonable efforts required by § 17a-112 (j) (1) to reunite him with Oreoluwa before it filed the petition to terminate his parental rights. We conclude that the department failed to undertake such efforts and, accordingly, we reverse the judgment of the Appellate Court on that basis.

Pursuant to § 17a-112 (j),[6] the trial court must make certain required findings after a hearing before it may terminate a party's parental rights. It is well established that, "[u]nder § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)]

exists by clear and convincing evidence. . . . In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. . . . Section [17a-112 (j) (3)] carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent." (Citation omitted; footnote omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 688–89, 741 A.2d 873 (1999). "If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child." Id., 689.

Also as part of the adjudicatory phase, "the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification . . . . Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the [custody of the commissioner], [§ 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Citation omitted; internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 632, 847 A.2d 883 (2004).

Subsequent to the Appellate Court's decision in the present case, this court clarified the applicable standard of review of an appeal from a judgment of the trial court pursuant to § 17a-112 (j). See *In re Shane M.*, 318 Conn. 568, 587, 122 A.3d 1247 (2015); see also *In re Gabriella A.*, 319 Conn. 775, 789–90, 127 A.3d 948 (2015). In those cases, this court clarified that "[w]e review the trial court's subordinate factual findings for clear error. . . . We review the trial court's ultimate determination that a parent has failed to achieve sufficient rehabilitation [or that a parent is unable to benefit from reunification services] for evidentiary sufficiency . . . ." *In re Gabriella A.*, supra, 789–90. We conclude that it is appropriate to apply the same standard of review of a trial court's decision with respect to whether the department made reasonable efforts at reunification. See id.; see also *In re Jorden R.*, 293 Conn. 539,

558–59, 979 A.2d 469 (2009). Accordingly, we conclude that we must review the trial court's decision in the present case with respect to whether the department made reasonable efforts at reunification for evidentiary sufficiency.

In the present case, the trial court determined that "the department has made reasonable efforts to locate and reunify Oreoluwa with the [respondent] given the circumstances." In making this finding, the trial court first recognized that the respondent's presence in Nigeria limited the type and number of services that the department could provide to him. The trial court further relied on the fact that the department maintained communication with the respondent, contacted the resource named by him who resided in the United States, attempted unsuccessfully to provide electronic visitation and communication with Oreoluwa through Skype, and provided the respondent with contact information for the Nigerian consulate in New York. The Appellate Court affirmed the decision of the trial court, concluding that, under the circumstances of this case, "the trial court's finding that the department made reasonable efforts to reunify Oreoluwa with the respondent was not clearly erroneous." *In re Oreoluwa O.*, supra, 157 Conn. App. 502.

In the present case, the department filed the petition for termination of the respondent's parental rights on December 23, 2013. At that time, Oreoluwa was approximately eleven months old.

At the time that the commissioner filed the petition for termination of the respondent's parental rights, the respondent had taken significant steps to remain involved in Oreoluwa's life. The respondent paid for the hotel where Oreoluwa and his mother initially had resided. The respondent also repeatedly attempted to contact the cardiologists who were caring for Oreoluwa, but did not receive any communication from them. The respondent also was in "constant contact" with the department, calling once a week and e-mailing more frequently to receive updates regarding Oreoluwa. The respondent also identified possible placement resources for Oreoluwa in the United States, which were ultimately unsuccessful.

Furthermore, the respondent repeatedly requested that he be allowed to communicate with Oreoluwa through Skype. Although the department's employees repeatedly requested that the department obtain the necessary equipment to enable this video conference—namely, a tablet—the department never approved the request and the respondent was never allowed to video conference with Oreoluwa.

Prior to the commissioner filing the petition for termination of the respondent's parental rights, the respondent filed two applications for visas to travel to the

United States. Both of the respondent's applications for visas were denied.

At the time that the commissioner filed the petition for termination of the respondent's parental rights, Oreoluwa had undergone multiple cardiac procedures, which had been successful. Nevertheless, a December, 2013 social study prepared by the department indicated that Oreoluwa would "require several cardiac procedures and surgeries throughout his life according to his cardiologist . . . ." It further indicated that Oreoluwa "is not able to travel to Nigeria due to his medical status and it is unclear at this time when he would be cleared to travel."

The medical information presented at the trial in this matter in March, 2014, contained no further information about Oreoluwa's medical condition either at the time the commissioner filed the petition for termination of parental rights or up to the time of trial. Indeed, the medical information in the form of affidavits from Oreoluwa's physicians dated back to April, 2013.[7] Furthermore, the only evidence presented at trial that related to when Oreoluwa would be cleared to travel indicated that, before he was born, physicians expected that he would be unable to travel for at least one year from his birth.

At the time of the trial, the department entered into evidence a study in support of a permanency plan dated January 14, 2014. In that study, the department reported that Oreoluwa had undergone another cardiac catheterization on December 3, 2013, which "went well." The report also indicated that Oreoluwa had an appointment with his pediatric cardiologist on January 6, 2014, and that he is "doing well and can start on whole milk and more solid foods." The study further stated that another appointment with his pediatric cardiologist would be scheduled in two months and that "[t]he cardiac and surgical teams will meet prior to this appointment to discuss how they are going to proceed." This study repeated the same lines from the December, 2013 social study as follows: "[Oreoluwa] will require several cardiac procedures and surgeries throughout his life according to [his cardiologist]. Oreoluwa is not able to travel to Nigeria due to his medical status and it is unclear at this time when he would be cleared to travel. There is also uncertainty regarding the medical care he would be able to receive in Nigeria and if his ongoing medical needs would be able to be met."

The trial court found that, "[a]s of December, 2013, [Oreoluwa] was not able to travel to Nigeria due to his medical status, and it was not clear when he could do so." The trial court cited to the department's study of the permanency plan as the source for the foregoing statement. The trial court further found that Oreoluwa "was still not cleared to travel as of the date of the trial." The trial court did not cite to any authority for the

foregoing statement about Oreoluwa's medical status at the time of trial. The trial court made no findings as to when Oreoluwa would be cleared to travel or when his medical team was meeting to discuss his future medical plan, despite the fact that the department's own exhibit revealed that Oreoluwa's cardiac and surgical team would be meeting prior to his appointment in March, 2014, to develop a plan for his future medical care. Indeed, there was no information presented at trial indicating whether Oreoluwa had any surgeries or cardiac procedures scheduled at that time.[8]

The trial court then concluded that "the clear and convincing evidence establishes that the department has made reasonable efforts to locate and reunify Oreoluwa with the [respondent] given the circumstances. . . . [The respondent's] absence from the state, and indeed from this country, has limited the type and number of services that the department has been able to provide to him."

In considering whether, in the present case, the Appellate Court properly upheld the trial court's finding that the department had made reasonable efforts to reunify the respondent with Oreoluwa, we are mindful that "the requirement that the department make reasonable efforts to reunite parent and child affects the substantive rights of the parties to a termination proceeding. The requirement of reunification efforts provides additional substantive protection for any parent who contests a termination action, and places a concomitant burden on the state to take appropriate measures designed to secure reunification of parent and child." *In re Eden F.*, supra, 250 Conn. 696. Furthermore, we are mindful that the burden is on the commissioner to demonstrate that the department has made reasonable efforts to locate the parent and to reunify the child with the parent. See, e.g., *In re Gabriella A.*, supra, 319 Conn. 777 n.4 ("[t]he [commissioner] must prove either that [the department] has made reasonable efforts to reunify or, alternatively, that the parent is unwilling or unable to benefit from reunification efforts" [internal quotation marks omitted]). "[R]easonable efforts means doing *everything reasonable* . . . ." (Emphasis added.) *In re Samantha C.*, supra, 268 Conn. 632.[9]

In examining the reasonableness of the department's efforts in the present case, we are guided by the Appellate Court's decision in *In re Shaiesha O.*, 93 Conn. App. 42, 887 A.2d 415 (2006). In *In re Shaiesha O.*, the commissioner filed a petition to terminate the parental rights of the child's mother and father, prior to learning the results of a pending paternity test. Id., 46. Once the results of the paternity test were known, the department notified the father and he objected to the petition to terminate his parental rights. Id.

In reversing the termination of the parental rights of

the father, the Appellate Court relied on the following facts: "Despite learning on December 10, 2002, that the [father] might be [the child's] father, the department did not make any attempt to contact him until March 17, 2003, when [a department social worker] left him a message regarding the taking of a paternity test. For the approximately ten week period from the first contact the department had with the [father] until the filing of the petition, [the department social worker] had two brief telephone conversations with the [father] regarding his paternity test. [The department social worker] testified that the first time that she had a discussion with him regarding a possible placement plan for [the child] was during June, 2003, after the filing of the petition to terminate the [father's] parental rights. She stated that as of June, 2003, the department had not facilitated any visitation between the [father] and [the child]. Significantly, she stated that if the [father] had requested visitation, she would have told him that he [could not] see [the child] until his paternity was confirmed." (Emphasis omitted.) Id., 49.

On the basis of the foregoing facts, the Appellate Court in *In re Shaiesha O.*, 93 Conn. App. 50–51, reasoned as follows: "[I]t is plain that prior to the filing of the petition to terminate the [father's] parental rights, the department made no efforts to foster a relationship between [the child] and the [father] because his paternity had not been established. However understandable that posture might be from a dispositional perspective, the department's disinclination to encourage a relationship between the [father] and [the child] can hardly be taken as evidence of an effort to reunify the two." Id., 49–50. The Appellate Court continued: "Given that evidentiary underlayment, we are not, as a reviewing court, able to find any support in the record for a finding that the department made any efforts, let alone reasonable ones, to reunify [the child] with the [father] before the commissioner sought to terminate his parental rights. . . . Additionally, since the record reflects that the department had not discussed with the [father] a placement plan for [the child] until after the commissioner had moved to terminate his parental rights, the record is devoid of any support for its contention that he was unable or unwilling to benefit from reunification efforts as of the date the petition was filed. Accordingly, we conclude that there is inadequate evidentiary support in the record for a finding that the department made the statutorily required efforts to reunify [the child] with the [father] or that he was unwilling or unable to benefit from such efforts."

In the present case, a review of the department's efforts to reunify the respondent with Oreoluwa demonstrates that all of those efforts were based on the department's presumption that the respondent would have to be present in this country to engage in reunification efforts and that Oreoluwa could not travel to Nigeria.

Despite knowing that Oreoluwa had successfully undergone repeated cardiac procedures and that his medical team was meeting to discuss future medical plans, the department took no steps to inquire into this medical information or to present it to the trial court.

Although the department's two studies indicated that "it is unclear at this time when [Oreoluwa] would be cleared to travel," the commissioner presented no evidence regarding any additional steps taken to obtain more specific information about when Oreoluwa may be cleared to travel or at least when the medical authorities would have some clarity regarding his future ability to travel. Because the respondent was having difficulty traveling to this country to be with Oreoluwa, the department's utter failure to determine when Oreoluwa would be able to travel to Nigeria can hardly be taken as evidence of an effort to reunify the two.

"In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights." Practice Book § 35a-7 (a). Our rules of practice and the relevant statutory provisions do not, however, address whether the trial court should consider evidence of events following the filing of the petition for termination of parental rights when determining whether the department has made reasonable efforts. In the present case, the trial court did examine the efforts made by the department "as of the adjudicatory date." Neither party asserts that it was improper for the trial court to consider events subsequent to the filing of the petition for termination of parental rights in the present case. Under the facts of the present case, however, we conclude that it was not improper for the trial court to consider events subsequent to the filing of the petition for termination of parental rights. At the time of filing the petition for termination of parental rights in the present case, there was uncertainty as to when Oreoluwa would be cleared to travel and his medical status was in a state of flux. Furthermore, the efforts that the department was able to undertake depended on Oreoluwa's changing medical status. Therefore, we conclude that it was necessary for the trial court to consider events subsequent to the filing of the petition for termination of parental rights in this case. Indeed, we conclude that the commissioner was unable to meet the burden of demonstrating that the department had made reasonable efforts to reunify Oreoluwa with the respondent without providing updated medical information about Oreoluwa at the time of the trial.

Furthermore, the trial court relied on summary statements in the department's studies that "[t]here is also uncertainty regarding the medical care [Oreoluwa]

would be able to receive in Nigeria and if his ongoing medical needs would be able to be met." The commissioner presented no evidence that the department had attempted to investigate what type of medical care Oreoluwa would receive in Nigeria. The department's failure to investigate the type of medical care available to Oreoluwa in Nigeria and its willingness to rely on "uncertainty" about that care is also not evidence of an effort to reunify the respondent with Oreoluwa. Indeed, even if the department had legitimate concerns about the medical care available to Oreoluwa in Nigeria, those concerns do not relieve the department of its burden of making reasonable efforts to achieve reunification by engaging the respondent and making available services aimed at instilling in him healthy parental skills. See *In re Vincent B.*, 73 Conn. App. 637, 646–47, 809 A.2d 1119 (2002) (concerns regarding father's perceived plans after reunification did not relieve department from making reasonable efforts to achieve reunification), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003).[10]

In the present case the trial court's finding that the department made reasonable efforts was based on the following facts: (1) the department maintained communication with the respondent; (2) the department contacted the resource named by the respondent who resided in the United States; and (3) the department attempted unsuccessfully to provide electronic visitation and communication with Oreoluwa through Skype. Without updated medical information regarding Oreoluwa's ability to travel and medical needs, however, we conclude that the commissioner did not meet the burden of demonstrating that the department did "everything reasonable" under the circumstances to reunite the respondent with Oreoluwa. See *In re Samantha C.*, supra, 268 Conn. 632. Therefore, we conclude that the Appellate Court improperly determined that there was adequate evidentiary support for the trial court's finding that the department made reasonable efforts to reunify the respondent with Oreoluwa.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court only with respect to the termination of the respondent's parental rights and to remand the case to the trial court for further proceedings consistent with this opinion.

In this opinion ROGERS, C. J., and PALMER, ZARELLA, McDONALD and ROBINSON, Js., concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** May 31, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] We granted the petition of the respondent father, Olusegun O., for certification to appeal, limited to the following issues: (1) "Did the Appellate Court properly affirm the trial court's determination that the [Department

of Children and Families] made reasonable efforts to reunify the [minor] child [Oreoluwa O.] with the respondent [father]?"; (2) "Did the Appellate Court properly affirm the trial court's determination that [Oreoluwa] had been abandoned?"; (3) "Did the Appellate Court properly determine that the respondent [father] lacked standing to assert a claim that [Oreoluwa's] fundamental right to family integrity was violated by the use of a judicial process to terminate [the respondent] father's parental rights that deprived [the] respondent [father] of meaningful notice and an opportunity to be heard?"; and (4) "If the answer to question number three is in the negative, was [Oreoluwa's] fundamental right . . . to family integrity violated because [the respondent] father was denied a meaningful notice and opportunity to be heard?" (Internal quotation marks omitted.) *In re Oreoluwa O.*, 317 Conn. 914, 116 A.3d 813 (2015). In view of our decision regarding the first certified question, it is unnecessary for us to reach the remaining three questions, although we have serious concerns regarding both the sufficiency of the grounds for termination, and the procedure used during the termination proceeding.

[2] We note that the trial court also terminated the parental rights of the respondent mother, Adebola O., who is not a party to the present appeal. See *In re Oreoluwa O.*, 157 Conn. App. 490, 492 n.1, 116 A.3d 400 (2015). In the interest of simplicity, we refer to Olusegun O. as the respondent in this opinion. We also note that counsel for the minor child has adopted the appellate briefs submitted by the petitioner, the Commissioner of Children and Families, before both the Appellate Court and this court. See id.

[3] We note that § 17a-112 has been amended by our legislature since the events underlying the present appeal. See, e.g., Public Acts 2015, No. 15-159, § 1. These amendments are not, however, relevant to the present appeal. For the sake of simplicity, all references to § 17a-112 within this opinion are to the version appearing in the 2016 supplement to the General Statutes.

[4] See footnote 2 of this opinion.

[5] See footnote 1 of this opinion.

[6] General Statutes (Supp. 2016) § 17a-112 (j) provides in relevant part that a trial court may grant a petition for termination of parental rights "if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent . . . unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) (A) the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding, or (ii) is found to be neglected, abused or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; [or] (E) the parent of a child under the age of seven years who is neglected, abused or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families . . . ."

[7] The dissent asserts the following: "[T]he majority's conclusion suggests that the only evidence in the record relevant to whether it could be determined as of the date of the trial when Oreoluwa would be medically cleared to travel was the April 29, 2013 affidavit by Oreoluwa's treating cardiologists. In fact, the majority incorrectly states that 'the only evidence presented at trial that related to when Oreoluwa would be cleared to travel indicated

that, before he was born, physicians expected that he would be unable to travel for at least one year from his birth.' That statement ignores evidence that supports the judgment of the trial court. Specifically, the petition for termination of parental rights, which was admitted into evidence at the trial, relies on much more recent reports offered by Oreoluwa's physicians, reports that provide ample support for the trial court's finding, particularly given the highly deferential standard of review accorded to the trial court's subordinate factual findings. It is helpful to review the evidence in detail." We disagree. We conclude that the trial court's finding that the department had established by clear and convincing evidence that it had made reasonable efforts to reunify Oreoluwa with the respondent was not supported by sufficient evidence.

Specifically, at trial, the department had the burden of producing evidence to establish that it had made reasonable efforts in reuniting Oreoluwa with the respondent. We conclude that a critical aspect of determining whether the department had made reasonable efforts at reunification was to determine when, if ever, Oreoluwa would be cleared to travel to Nigeria because the evidence indicated that the respondent had been unsuccessful in coming to the United States to date.

In support of its position that the department had made reasonable efforts at reunification, the commissioner introduced the following: an affidavit from Oreoluwa's physicians, social studies prepared by the department, and testimony from the department's social worker. Contrary to the dissent's representations, this evidence did not provide sufficient evidence to support the trial court's finding that the department had made reasonable efforts at reunification. Instead, the affidavits from the physicians were approximately eleven months old at the time of trial and did not include information about Oreoluwa's ability to travel. The social studies prepared by the department only contained the same conclusory information repeated from study to study: "[Oreoluwa] will require several cardiac procedures and surgeries throughout his life according to [his cardiologist]. Oreoluwa is not able to travel to Nigeria due to his medical status and it is unclear at this time when he would be cleared to travel. There is also uncertainty regarding the medical care he would be able to receive in Nigeria and if his ongoing medical needs would be able to be met."

Furthermore, the testimony from the department's social worker, Cynthia Pfeifer, was equally insufficient. Specifically, Pfeifer testified as follows during cross-examination by counsel for the minor child:

"Q. Okay. Now, speaking of [Oreoluwa] being medically cleared to travel [to] Nigeria, was that ever considered by the department?

"A. Meaning what?

"Q. [Oreoluwa] traveling to Nigeria since his parents could not come to the United States?

"A. He medically is not able to travel to Nigeria.

"Q. Okay. And what are the reasons?

"A. He has a unique heart condition.

"Q. Okay.

"A. In layman's terms, the medical team . . . has not sanctioned him to travel. He requires a sequence of surgeries and catheterizations to build the valves in his heart, as [I understand] it.

"Q. Okay.

"A. When [Oreoluwa's mother] learned of the medical issues while she was pregnant, the [medical] team . . . gave her a choice; you can either deliver here in the United States and he will not be able to travel for minimally [one] year, or you can go back to Nigeria and deliver and he would not have been expected to live for, I believe it was, more than a few months. . . .

"Q. Okay. So, now you mentioned [Oreoluwa] would be able to travel minimally in [one] year. Has . . . [one] year gone by since [he was] born?

"A. Yes.

"Q. Okay. And he's still not cleared to travel?

"A. Correct."

The foregoing evidence was wholly insufficient for the trial court to make a determination as to whether the department had made reasonable efforts at reunifying Oreoluwa with the respondent because it did not indicate when, if ever, Oreoluwa would be able to travel to Nigeria.

[8] The dissent asserts as follows: "[A]t oral argument before this court, the respondent conceded that Oreoluwa's original prognosis was that he would be medically unable to travel for at least one year. . . . Subsequently, however, Oreoluwa's physicians provided an updated, less definite estimate of when he would be able to travel. . . . This estimate, provided when Oreo-

luwa was eleven months old, differs from the one that was provided at the time of Oreoluwa's birth, which established a possible end date of one year. By contrast, the more recent estimate provided no potential end date. That is, as compared to the initial estimate that Oreoluwa might be able to travel by his first birthday, the most recent report from his physicians, reflected in the social study that was filed when Oreoluwa was eleven months old, did not provide any estimate of the earliest date on which Oreoluwa could travel. I draw the reasonable inference from those two pieces of evidence, viewed together, in the light most favorable to sustaining the judgment of the trial court, that it remained unclear, at the time of the trial, when Oreoluwa would be medically cleared to travel. It would indeed be reasonable to infer that, if anything, it had become less certain when Oreoluwa would be medically cleared to travel." (Emphasis omitted.) Contrary to the dissent's representation, nothing in the December, 2013 study or the more recent January, 2014 study indicated that "it had become less certain when Oreoluwa would be medically cleared to travel." (Emphasis omitted.) Instead, these studies, which were prepared and written in the department's own language, reflect the department's neglect in failing to provide the trial court with any information about the medical prognosis of when Oreoluwa would be cleared to travel. These studies were not accompanied by any medical reports or documentation supporting the dissent's theory that the physicians declined to provide an estimate of the soonest date on which Oreoluwa could travel or that it had become more unclear when he would be cleared to travel. Indeed, these studies indicated that all procedures done to date had gone well and that he was not suffering developmental delays from his medical condition. Moreover, the trial court never made any factual finding that Oreoluwa's medical status had changed and that it had become more unclear when he would be able to travel and the dissent's reliance on this "fact" constitutes improper fact-finding.

Furthermore, the dissent asserts that "[t]he majority also relies on the fact that Oreoluwa was scheduled to have appointments with his pediatric cardiologist in January and March, 2014, as a basis for its conclusion that the trial court's finding that the department made reasonable efforts was not supported by sufficient evidence." We disagree. The relevance of the January and March, 2014 medical appointments is that more updated medical information was available to the department, but was not presented to the trial court. Instead, we conclude that without the most up to date and complete medical information available, the trial court was not able to make an adequate determination as to whether the department had made reasonable efforts to reunify Oreoluwa with the respondent.

[9] The dissent asserts that "[t]he revised, more conservative estimate that cardiologists provided as to when Oreoluwa would be medically able to travel, taken together with [the testimony of Cynthia Pfeifer, the department's social worker], which the court found to be credible, and the trial court's specific findings in the articulation, when construed in the light most favorable to sustaining the judgment, provide sufficient evidentiary support for the conclusion that as of the date of the trial on the petition for termination, it remained unclear when Oreoluwa would be cleared to travel. The majority construes the evidence in a different light—declining to infer that the difference between the initial estimate given to the department by Oreoluwa's cardiologists, as testified to by Pfeifer, and the later estimate that the cardiologists provided to the department, as noted both in the social study in support of the termination petition and the social study in support of the permanency plan, had any meaning. Certainly, it is possible to construe the evidence in the manner that the majority does. I do not dispute that, nor is it necessary to do so. The mere fact that the majority's construction of the evidence is one possible manner of viewing it, however, is not sufficient given the standard of review, which requires us to construe the evidence in the light most favorable to sustaining the judgment. The majority's rationale would be supported only if it could demonstrate that the construction of the evidence that I suggest is not a reasonable one. And that, the majority cannot do." (Emphasis omitted.) We disagree. As we have explained previously in this opinion, it is well established that the burden is on the commissioner to demonstrate by clear and convincing evidence that the department has made reasonable efforts to locate the parent and to reunify the child with the parent. Contrary to the dissent, we cannot conclude that the record in the present case provides sufficient evidence to support the trial court's conclusion that the department met its burden in the present case.

Furthermore, in support of the conclusion that the trial court's determination that the department had made reasonable efforts at reunification was

supported by sufficient evidence, the dissent repeatedly relies on facts not found by the trial court. As we have repeatedly recognized, "[i]t is elementary that neither this court nor the Appellate Court can find facts in the first instance. . . . [A]n appellate court cannot find facts or draw conclusions from primary facts found, but may only *review* such findings to see whether they might be legally, logically and reasonably found . . . ." (Emphasis in original; internal quotation marks omitted.) *Parisi* v. *Parisi*, 315 Conn. 370, 385, 107 A.3d 920 (2015).

[10] Indeed, if the medical information indicated that Oreoluwa would have been able to travel to Nigeria at some point in the not so distant future, it would likely have been reasonable for the department to conduct a home study of the respondent in Nigeria. The dissent implies that, under Connecticut law, it would not be reasonable to require such a study. The dissent's position is, however, controverted by the position of the department at oral argument in this court. The department's attorney conceded at oral argument that, if, for example, the evidence in the record indicated that Oreoluwa would have been able to travel six months after his cardiac procedure in December, 2013, it would have been reasonable for the department to conduct a home study in Nigeria. Furthermore, contrary to the dissent's position, many courts in other jurisdictions have recognized that home studies from foreign countries may be reasonable. See, e.g., *In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012) ("there is no indication from the record that the [d]epartment considered the possibility of the children living with [the father] in Mexico; [the father] was never offered a service plan . . . [and] because the [d]epartment never assessed [the father's] situation in Mexico, there is a lack of evidence establishing the instability of [the father's] home in Mexico"); *In re Doe*, 153 Idaho 258, 263, 281 P.3d 95 (2012) (reversing judgment of trial court terminating father's parental rights and requiring that child be reunified with father in Mexico where home study from child protection service "stated that [the father] was financially, emotionally, physically, and mentally able to provide for [his daughter], that his home would be a suitable placement for [his daughter], and that [the Mexican child protection service] would provide services to [the father] if [his daughter] were placed with him"). Furthermore, contrary to the dissent's position, it is not unheard of for child protective services in the United States to work with intercountry case management services. Indeed, "[b]etween January 2011 and January, 2013, International Social Service-USA Branch . . . Intercountry Case Management Division provided 696 separate intercountry case-management services to 915 children in the American foster-care system. These services were provided in seventy-three different countries and involved forty different . . . states. The services provided ranged from simple relative notification of a child in care to complex home studies, background checks, and in-depth assessments on family members for potential placement of a child." (Footnote omitted.) F. Northcott & W. Jeffries, "Forgotten Families: International Family Connections for Children in the American Public Child-Welfare System," 47 Fam. L.Q. 273 (2013).

The dissent criticizes our reliance on these authorities, noting that "those authorities do not speak to the uncontroverted fact that in this state an undertaking of this sort has never been done, there is an absence of any applicable statutes, regulations or procedures that would serve to effectuate it, and there is a conceded lack of any liaison in Nigeria." We disagree. The dissent is improperly finding facts. The trial court did not find, and there is no evidence in this record to support, the fact that "in this state, [a home study in a foreign country] has never been done . . . ." Although the social worker in the present case was not aware of other instances of a home study being performed in another country and the respondent's counsel could not find such information, there is nothing to support the factual leap that the dissent is making. Indeed, it is not surprising that research performed by the respondent's counsel did not reveal that such a study had been performed because of the confidential nature of the department's records. Accordingly, we do not find the dissent's criticism of these authorities persuasive.

———————————————